The next case is SAPA v. Liberty Mutual. Good afternoon, Your Honor. Just hold on one second. Make sure your colleagues are all settled in over there. Yes, sir. Good afternoon, Mr. Martin. Good afternoon, Your Honors, and may it please the Court, James Martin, for the appellants. I would like to reserve five minutes for review. Sure. SAPA purchased comprehensive general liability insurance in this case to cover precisely the risks that were at issue in the Marvin litigation from the incorporation of its lineals into the products ultimately sold by Marvin to customers who later made claims for damages caused by that product. So let me ask you, Judge Mannion, his touchstone, as it were, was the complaint in the underlying civil litigation out of Minnesota, correct? Correct. So identify for me which ones of these counts you're suggesting would trigger insurance coverage. So, Your Honor, let me preface my answer to that question by saying that we believe it was error for the complaint to be the touchstone of the analysis in this case. As we've set forth in our briefing and the case law provides, the complaint becomes the touchstone of the analysis in a case like this one only when the duty to defend is an issue. And the duty to defend is not an issue in this case. The policies that are in this case, one of them disclaims the duty to defend, 11 of them do not have a defense duty, and the only one that does isn't triggered until the underlying coverage is exhausted. So importantly here, Your Honors, the question is whether the settlement was covered. The settlement is obviously well downstream of the complaint. And finally, and specifically, a settlement is evaluated based on the record that existed when the settlement was made, and there is no principle of Pennsylvania law and no case that the defense, the insurers have cited that says the complaint. If I understand your position correctly, the complaint is not the touchstone. It's the entire body of discovery that was developed that would suggest whether or not coverage is triggered. So when we are talking about the duty to defend is not on the table. No one was asking for a defense here. It wasn't cost for the ongoing litigation. And the complaint is the touchstone in that circumstance. When coverage for the settlement is the issue, the complaint is looked to, but it's still a contextual inquiry, Your Honor. And what's the contextual inquiry? Mr. Martin. Yes. I understand what your argument is. Your argument seeks to get us to treat this as an eve of trial settlement case and for us to articulate a body of law which is different than merely a duty to defend statement. But as I see it, the problem that we have in accepting your proposed argument is that we have to look at Pennsylvania law. And I just cannot find anywhere where the Pennsylvania Supreme Court has said that you would treat this eve of trial settlement claim differently than another case. So where do we go to? So where we go is twofold, Your Honor. And by the way, Judge Restrepo, I will point to the provisions of the complaint that I think if we were functioning under the four corners of the complaint rule, we would give rise to coverage. But let me answer your question this way, Judge Fisher. First of all, this case involves coverage for a settlement without regard to, as I said, the duty to defend. Okay. The second point is that when the duty to indemnify is the issue, the Pennsylvania Supreme Court has said and Pennsylvania courts have also said that it's the facts and the underlying action and the conduct and the underlying action that determines whether there's coverage. Now, that analysis is made, Your Honors, in the context of the complaint and what it sets forth. But by the time you get to trial, you know what the facts are that underlie the claims. And our point is that the four corners of the complaint, if they're relevant then, must be construed in light of what's actually going to be tried. That may give rise to indemnity. It may not give rise to indemnity. And to your point about the Pennsylvania Supreme Court, there is no Pennsylvania Supreme Court or court of appeal case that suggests that that four corners of the complaint analysis carries forward into this context. Is there anything from the Pennsylvania Superior Court? Only that would suggest that we can perform a different analysis on a different set of facts where the duty to indemnify, not the duty to defend, is involved. The distinction is material in this case. In fact, the insurers, when this case was in the district court, conducted two years of discovery on the very issue I'm talking about. They disclaimed that the duty to defend was in play and said this case was about the duty to indemnify. I'd like you to come back to Judge Restrepo's question because I, too, would be interested in hearing. If we do limit our analysis to the four corners, I'd like to know what facts in the Marvin complaint give rise to coverage. But if we don't and if we expand the analysis beyond the four corners, how do we know what facts to rely on when the court in Minnesota denied summary judgment because there were disputed issues of fact? Well, on that latter point, Your Honor, that's just the point. The court below would have to reconsider this case to look at the record facts, substantiating the claims that were being made under the complaint and how they were going to be defended. That would be the universe of facts you would look to to determine coverage. And what authority in Pennsylvania or the Third Circuit do you have to support that position? Well, only the cases that, first of all, deal with the duty to indemnify, which again is the case. Give me a case. Well, the cases that define the duty to indemnify are in our brief, and I can't pull one off the top of my head right now. But the point about the duty to indemnify is it's tethered to the facts in the action, right? Well, I'm reading from a Third Circuit opinion, 2010, specialty services. Yes. Under Pennsylvania law, a carrier's duty to defend and indemnify, insured in a suit brought by a third party, depends on a determination of whether the third party's complaint triggers coverage. Right. So let's go back to the complaint. So do it. There's 13 counts. Please, one answer. There are 13 counts in this complaint. Identify which counts trigger coverage. So first of all, Your Honors, we are reading the nature of the claims in the complaint, not the specific labels on the causes of action. Throughout this complaint, in Paragraph 56, Paragraph 95, Paragraph 96, Paragraph 97, Paragraph 107, we have references to defective products. So we know that's the source of it. Second, we know from the complaint that the people who have brought the claims that are essential to the damages are customers of Marvin's, and the customers have no contractual relationship with my client at all, and their claims of necessity are based on common law. Second, or third. Nobody brought the claims against Marvin. Well, they did, Your Honor, but the source of the claims is common law duties of care. There isn't any. But Marvin ended up fixing the windows, paying for the damages, and they consequently made the claim that they did the Minnesota Courts against SAPA. That did not change the nature of the underlying claims, though, Your Honor. In other words, they were product defect claims made by customers who had no contractual relationship with SAPA, and accordingly those are based on common law duties of care. They were passed on to SAPA as damages like the Indelex case, but in the causes of action in the complaint, the warranty of fitness and the standards under the warranty of fitness for suitability of the manufacturer of the product were linked to tort-based duties, standard operating procedures, the failure to comply with industry standards outside of the specifics of the contract. So this was the claim that was required to be brought by Marvin under Minnesota law. It brought forward the damages to the consumers. And in those causes of action, Act 156, Act 159, Paragraph 21, Paragraph 25, Paragraph 30, Paragraph 55, 56, the complaint reflects common law duties of care under the warranty of fitness brought forward by Marvin to recover damages that are within the occurrence definitions. Let me ask you a question about your proposed rule, what I'd consider a new rule. How would insurers monitor this? Under the Four Corners Rule, they can look at the complaint to compare it to the insurance policy. How would an insurer have to monitor every complaint that's been filed that might bring an indemnity obligation? Actually, Your Honor, I think Your Honor made my point. They don't have to monitor. Because this case isn't asking an insurer to step in and assume a duty while the case is ongoing. The case can proceed until the issue is actually right. And the rightness issue comes when the settlement is entered. That's the first time. What do they look at, though? Well, at that point, you look at what is going to be proven under the allegations of the complaint. That creates the risk exposure. But it was settled. Nothing was proven. Well, no, but, Your Honor, cases settle when insurance coverage is provided all the time. You look at the underlying. Right, but you don't know what would have been proven if the case was settled. Well, but it's the potential for coverage, Your Honor, that we care about in this situation. So you evaluate the risks as created by the proof in the case. You don't have to take the case through trial and figure that out. Otherwise, the settlements would be meaningless. So you look at how the case was going to be proved by the plaintiff, defended by the defendant, and see whether there was risk exposure in those circumstances. But if you do it that way, how does the insurer know what he or she is insuring? Well, what you do is you conduct two years of discovery, as happened in this case, and you bring forward the potential for coverage under all the occurrence definitions in the policy and under all the contractual provisions that provide for coverage. Then you evaluate that. If there's disputes about those underlying facts, then you go to trial on it. And here, of course, we're arguing that we were entitled to a trial under three occurrence definitions, only one of which was considered by the district court in its opinion, under the products completed hazard coverage, which involved trade and custom evidence and custom and usage evidence, which was not considered, and finally under the insured contract provision, which also was not considered. Could you talk a little bit about those differing occurrence definitions? Well, yes. First of all, the one that was in play in the Pennsylvania cases, with the exception of Indilex, was the objective definition. The others have a subjective definition that depends on the expectations of the insurer, something that was never looked into here. But it's clear from the complaint on its face that the damages here weren't expected or intended by the insurer. The complaint has specific allegations showing that the insurer believed that the contract was compliant. The record shows that, or the product, excuse me, the record shows that there were other forces at work outside the design of the product that caused the harm, and therefore there was a potential for a covered occurrence within the confines of the complaint as the case was going to be litigated. The subjective and intended from the standpoint of the insured analysis goes directly to intent to cause the harm, and that was a disputed issue in this case. The second definition, injurious exposure, doesn't have an accident clause in it at all, and the facts of this case can be comfortably fit within that definition, looked at from the standpoint of the insured, which is what Pennsylvania law requires. The fact of the matter is that when this case is treated uniquely as it should be, it's a lot closer to indelex than it is to any of the other cases. It's a product that was made and incorporated into someone else's end product that they made. It was sold by contract to customers who brought tort-based claims or could have brought tort-based claims to make a recovery, and under those circumstances, examining the intent of the insured was critical. Indelex is the only case, Your Honor, that had the expected and intended occurrence definition in it, and the result came out exactly the way we would expect it to. It was a potential for coverage under the policies that we issued. I see that I'm into my rebuttal time. If there are no further questions, I will wait for rebuttal. Great. We'll see you, sir. Thank you. Good afternoon, Mr. Cozen. Good afternoon, Your Honors. I'd like to do something a little bit unusual, if you don't mind. Not at all. What I'd like to do is make four points, and then I'd like to make my argument. But the four points I'd like to make are, first, there is no Pennsylvania Supreme Court decision which holds that discovery somehow magically amends the complaint. And we have the four corners rule, but no Pennsylvania court, superior or supreme, has ever held that this discovery somehow magically amends the complaint, nor that actual facts regarding indemnification are determined by anything other than a trial by judge or jury. Point number two, all counts in the underlying complaint that had anything to do with tortious conduct were thrown out by the Minnesota court. So all you have left were breach of contract actions. Now I'm hearing that maybe there's tortious conduct for which they want coverage, but they're judicially stopped from making that claim. They won in the Minnesota court. How can they come into this court and talk about tortious conduct being covered? Third, there is a basic fallacy upon which their entire argument is based. If there is no duty to defend, there is no duty to indemnify. That is a basic principle of Pennsylvania law. The Indelex case itself quotes from that, and there are many, many other cases, the Bellevue case and Knight's book case, et cetera, that states that principle over and over and over again. When we talk about, and finally, when we talk about potential for coverage, we're talking about potential for coverage for the purpose of determining the duty to defend based upon the allegations of a complaint. We're not talking about the potential for coverage based upon what we learned in discovery for purposes of determining not whether or not an insurer must settle, but whether or not it owes a reimbursement obligation. There is no obligation under any of these policies that an insurer must settle. The only obligation is that it has to defend under certain circumstances and indemnify under certain circumstances. Now to my argument, Your Honor. Judge Mannion, following a long line of Pennsylvania Supreme and Superior Court cases, which articulated the basic principles of insurance law, clearly got it right. There is nothing in this case which is unique or extraordinary to compel a different result. The district court correctly determined, and SAPA really does not, as I understand it, seriously deny that Marvin's complaint itself did not allege facts establishing an occurrence. Thereby, it did not trigger a duty to defend. Since it did not trigger a duty to defend, under Pennsylvania law, there is no duty to indemnify. In the Lex specifically held, if an insurer does not have a duty to defend, then it does not have a duty to indemnify. And you can take a look at Bertamco and Bellevue Holdings as well. Mr. Cozen. Yes. Do you think Judge Mannion gave enough discussion, as it were, to the expected or intended language in some of these insurance policies? Yes, I do. But that is since the policies that I represent are what he called the objective policies, that is, the liability policies that say an occurrence is an accident. Okay. Okay. I will leave it to co-counsel to discuss that issue if you don't mind. Thank you, Your Honor. But the district court clearly Let me ask you this, Mr. Cozen. Yes, sir. And you're talking about the four corners rule itself. Yes, sir. I mean, why isn't Mr. Morton's proposed hybrid rule a rule that makes some sense for a case like this? They're not looking for a duty to defend. They're not looking for defense. Defense was already picked up by someone else. There was a settlement. Okay. There was a settlement in this underlying case for which they're trying to seek recovery. Why shouldn't that hybrid rule be something that makes sense for us in looking because Pennsylvania's rule isn't as clear as you argue it is. I've read the cases. Converter's a little different. All the cases are a little different. We're always faced with different cases, different facts. I'm trying to apply the law to a different set of facts. That's what we have to do. Yes, Judge Fischer, let me say this. Number one, I highly recommend you read the Hagel case by then-Judge Wecht, now Justice Wecht, that goes through the whole history. I think it is pretty clear. We have bright-line law. Now, whether or not as a matter of policy, I mean public policy, that's good or bad, it is a contractual relationship between an insurer and insured in the commercial context which has been honored for a long time but particularly since 2006 after Converter by everyone, including this Court in three different cases, one of which Judge Estrepo sat on just last exactly one year ago in the Lupo case, which I'll get to in a second. But I want to answer your specific question. The pencil bright-line rule delivers certainty. If one goes outside the rule, you risk several very, very undesirable things. The first is that every litigation over coverage in the liability insurance context now becomes a trial within a trial. You have to demonstrate that the facts that you developed through discovery, even though there weren't allegations which triggered the duty to defend, nevertheless gives rise to some duty to indemnify. So you have to go through trial within a trial. Secondly, it's a violation of the basic contractual provisions upon which we underwrite these policies. And thirdly, turning to the duty to indemnify, they have turned the duty to indemnify on its head. That is exactly what they've done. There can be no duty to indemnify unless there is a duty to defend. The duty to defend is broader. The duty to indemnify is narrower. So even though you have to defend a case because it potentially comes within coverage, you might not have to indemnify the insured because when they get down to proving when the plaintiff gets down to proving the case, the underlying case, they can't prove it the way they alleged it in the complaint which triggered coverage. So it is true that there can be no duty to indemnify unless there is a duty to defend, and the former is dependent on the latter. The important point, I think, for your purposes, Judge Fischer, is that these are not two unconnected concepts. The duty to defend and the duty to indemnify are not unconnected. You cannot say with a straight face under Pennsylvania law that you have a triable issue of fact with regard to foreseeability when it comes to the duty to defend, the duty to indemnify. But you have no such triable issue of fact as to the duty to foreseeability when it comes to the duty to defend. Because from Kverner on to Abbott Furness, on to the Gambone, Indelex, and then the cases in your court, CBP, and the other cases, Lupu, which you were part of, Judge Restrepo, it's very, very clear that there's no need when you're looking at the complaint and the allegations of the complaint to make a factual inquiry about something which is as a matter of law a foreseeable consequence of a breach of contract, a breach of contract which in and of itself is not an accident. Now, I see Let me ask you this one specific question about the complaint. I think this falls under what you're arguing as opposed to the facts. Sure. But the underlying, the complaint in the underlying action, the Minnesota complaint, I think I'm correct that it did not allege that SAPA knew that a change in its pretreatment process would lead to an extrusion failure. I think that's a correct statement. I believe that's a correct statement. I believe I have the complaint right here and we can check it. But I think that's probably about correct. Okay. So my question is They didn't allege the contrary either. So even though you label it as an intentional act as opposed to an accident, with an unexpected or unintended result, why couldn't that act be an accident? I don't do that. That goes to Ms. Sacks. I don't do that. I simply say it's not an accident. And the reason it's not an accident is because it's not fortuitous. That question should be answered by Ms. Sacks. I think so. I do have my own answer, but I prefer that she go first. What is your answer? Well, my answer is that whether you get to neither foreseen by the individual or not, I think you're still dealing with the issue of fortuity. And as long as you're dealing with the issue of fortuity, it's out the door. And it's out the window as a matter of law. You don't have to get to the facts. There are certain things where we have made judicial determinations that things naturally, consequentially follow certain other things, and therefore, they are not fortuitous. They just don't happen accidentally. Let me – I say I have a red light, but I would like to finish, if you don't mind, just two thoughts. The bottom line. The bottom line under Pennsylvania law is this. The extrusions were designed pursuant to detailed specs set forth in the party's contract. Nobody denies that. The claims arose entirely from Sapa's failure to comply with the specs. Nobody denies that. The damages were based solely on the foreseeable economic losses caused by poor workmanship. Nobody seems to deny that. The claims, therefore, do not involve an occurrence and do not trigger coverage under a CGL policy. At the end of the day, this court is obliged to follow Pennsylvania law. The teaching of Paverner, Gambone, Abbott-Furness, Indelex, and Hagel adopted by this court in CBP, Lupo, and specialty service, which was, remember, Judge Stapleton's conflict of laws case, is clear. Where there is a suit alleging a contract obligation to make and deliver a non-defective product, and that agreement is breached, a CGL policy is not triggered because an occurrence has not been alleged, no defense obligation is owed, and no duty to indemnify arises. Second, damages to or foreseeably incident or ancillary to the faulty manufactured product are not the result of an accident and therefore are not an occurrence triggering defense and indemnity obligations under a liability policy as a matter of law. Third, applying the four corners rule, which we must apply if we're going to follow Pennsylvania law, and comparing the allegations of the complaint to the terms of the liability policy, neither the duty to defend nor the duty to indemnify is triggered. And given the clear and unambiguous terms of the policy, there's no allegation of some latent ambiguity which allows you to start questioning people's expectations. Clear and unambiguous language to contradict the complaint may be considered. This Court has no reason, I submit, in this case to deviate from the clear dictates of clear Pennsylvania law. I think you must affirm. Thank you. Thank you. Ms. Sachs. Good afternoon. May it please the Court. First of all, let me say that I agree with Mr. Cosen's answer to the question regarding the differences in the language, but I will, with the Court's permission, continue to respond to that. And I think it's important, first of all, to point out that that issue, although argued by my friend on appeal, was not raised in the trial court. And although the document is not in the very large appendix that the Court has, the document number is 182, and it is SAPA's own argument below saying there is no difference in this language. That was SAPA's position below. They said it doesn't matter, these couple of differences in the language. It doesn't matter. There is coverage under any one of them. In fact, SAPA said there is no factual dispute and move for summary judgment in its favor. For that reason. So this Court, I think it was a brokerage litigation case, said in order for this Court to consider an issue, it has to have been affirmatively presented to the Court below and developed so that the Court has the opportunity to rule on it. And in this case, that that was not done. SAPA argued the opposite, that it didn't matter. But having said that, the District Court did acknowledge that there were these differences in the language, which the Court said is immaterial anyway. Why is it immaterial? Because when you look back over the Pennsylvania cases, whether or not it's an accident or unexpected is essentially equivalent and was argued by SAPA on page 10 of that same document, that SAPA presented those two as equivalent. And all of these policies are the same. It's either an accident or unexpected. So if you look at the Pennsylvania cases that say the subjective language policies are ambiguous, and so they should be construed against the insurer. And the difference in this case, Your Honor, and why that, to the extent there is some support for that, it's when you're talking about the actions of a third party, who's someone different from the insured, and whether the insured knew or could expect or intend what that third party was going to do. In a faulty workmanship case, which is what this is, this is a garden-variety faulty workmanship case, you're always looking at it, whether the expectant or intended language is expressly in there or not, you're always looking at it from the standpoint of the insured, who here is the bad actor, if you will, the one whose conduct is at issue. I'd like to ask you one question about your waiver argument. Yes, Your Honor. Didn't they present the differences in definitions in the statement of material facts supporting their motion for partial summary judgment? Yes. The different language was all before the Court. Didn't they argue that at that time in that motion? No. Their summary judgment motion was based on the fact that there was no difference. Then, in response to the individual motions, the arguments were made with respect to a couple of the other provisions that I'm going to talk about, and which among the 27 or 28 different policies, there were some differing provisions and some differing arguments made about other aspects that, according to different carriers, also precluded coverage. But with respect to the argument about the differing language, that was not an argument that was affirmatively put to the trial court, and yet the trial court nevertheless considered it and said, I'm looking at Pennsylvania law. These are not material differences here. And it is true. And all you have to do is go back and look at the Gambone case. The Gambone case talked about whether the damages flowing from this faulty workmanship could be considered that core need for fortuity that a commercial general liability policy is based upon. And not only did they say no, they pointed out that if this argument were accepted, if you were to take this argument, which, by the way, is the very same argument that SAPA's amicus is making in this case, same exact arguments made in the Gambone case, and all reject it. And the court said that's because if you did this, and I think one of the panelists mentioned this before, you would never be able to know what you were insuring. You have to be, you can't let this just evolve and turn solely on what someone says their own workmanship may or may not have. They knew what the workmanship issue was. There is no dispute that there was a breach of contract, that the contractual specifications were not complied with, and that the need to replace the lineals was because of the contractual breach. So this is not unexpected. Did the district court say I've looked at Pennsylvania law and I find there's really no difference between the subjective and the objective language? Or my recollection is the district court just said I've looked at these policies. They all kind of use the word accident. So I'm going to treat them the same. The district court specifically said it's not an accident or unexpected. And that, in context of Pennsylvania law, that's correct. Because, again, looking from the standpoint of the insured and what Gambone said, you can't say that the consequences that flow from breaching a contract and faulty workmanship are unexpected. They're expected as a matter of law. They're reasonably foreseeable as a matter of law. And because of that, they are not covered by a general liability policy. And that went back to what Gambone said. Nobody would do business here. Nobody would write insurance policies here if you didn't know what your policy was going to end up covering. So the language difference is immaterial. The principle and the core requirement of fortuity is what all of the cases turn on. And here it's completely missing because this is, as my colleague said, this is a breach of contract case for faulty workmanship. And now what SAPA is doing is they're asking this court to force insurers to pay for a contractual obligation that SAPA had voluntarily assumed to pay for something that Marvin Windows itself had assumed with respect to its customers. This is not an accident. It is not unexpected. It is the foreseeable consequence flowing from faulty workmanship, just as the court said in Gambone. With respect to the other aspects of coverage that SAPA's counsel referred to, again, I'm sorry, going to turn back to Mr. Cozen's argument because of the other arguments, two of them fail for the same reason that this sort of turning Pennsylvania law on its head fails, which is that you need an occurrence, the products and completed operations hazard. That's not an affirmative grant of coverage. And, again, Judge Mannion went through this in detail and pointed out this is, it comes up in a couple of slightly different ways in the policies, but they all, none of it is an affirmative grant of coverage. The fact that there's a separate aggregate limit applicable to it doesn't create coverage. It just sort of bifurcates, I think was the word used, damages that might happen on the insured premises versus off the insured premises. But it all requires an occurrence. The same thing with the insured contract provision. An insured contract, as I just said, this is not asking somebody, forcing insurers to take on a voluntary obligation assumed by somebody else who assumed a voluntary obligation to the customer. This is, they're going back to requiring essentially a tort duty. It's only if the insured contract arose out of an occurrence. This is not an occurrence. Because there's not an occurrence, the insured contract provision doesn't apply either. And I want to be sure I touch on the reasonable expectations doctrine because, again, that was something that first of all should not, does not apply under Pennsylvania law to a commercial insured, except in very, very limited circumstances that are not present here, like an affirmative representation that you will be covered and then the policy doesn't cover it. There's no suggestion of that here. So the reasonable expectations doctrine doesn't even apply. But if it did, it certainly would not apply under these facts, because there's no indication of any reasonable expectation that faulty workmanship and breach of contract would be covered under a general liability policy. And there's no law to that effect. There's no trade usage, which was sort of the other, the arguments are a little bit overlapping by SAPPA. But, again, that's an argument that wasn't. You talked about expectations. I know there's no language controls, but why wouldn't a defective product, an injury from a defective product that a supplier provided, constitute the type of active malfunction that an insured would assume was covered under a general comprehensive liability policy? Your Honor, that's a great question. And if that were this case, I would agree with you. But that's not this case. This is not a situation where a, like a product defect case. And that's exactly how the subsequent decision in Hazel. Well, that's what you argue. I'm sorry? That's what you're arguing. We're saying it's defective workmanship, but it's not a product liability case. If the product had exploded and caused personal injury to someone, yes, that would be the kind of thing that would be under a. It rusted. It required the. That type of property, that is not. That was contract damage, not torque damage. And the cases go to great length to describe the difference between. So that defect is not an active malfunction. Correct. That is not an active malfunction. And there's a big difference. Remember, these were prepared or created based upon specifications that SAPPA agreed to follow. The problem is they didn't follow them. But there's no active malfunction, such as was found in Indilex, where an off-the-shelf product didn't act the way it was supposed to. This is a completely different situation. They changed their pretreatment process. But they didn't expect that in doing that, that the extrusions were going to damage the windows like they did. But, Your Honor, that again goes back to the discussion in Gambone. Whether you expect it, when you breach a contract, when you are that faulty actor, then the foreseeable consequences of breaching the contract are expected. That is expected as a matter of Pennsylvania law. And it's your own act. We're not speculating about a third party. So for that reason as well as all of the reasons identified by my colleague, Judge Mannion got this right. There is no support under Pennsylvania law for a whole new world of creating coverage. And we ask that this Court affirm. And on that foreseeable inquiry, does the foreseeability refer mainly to the accident that resulted in the damage or to the specific damage itself? Well, there wasn't an accident here. So in this particular situation, the foreseeability that Gambone was talking about is once you have the breach, the damages that flow from that are foreseeable and expected in terms of reasonable foreseeability. But if we were talking about whether or not something is an accident, that would be a different situation. But the accident is that when we get to cross into that tort duty, which we do not have here. Thank you. Thank you. Mr. Morton? Thank you, Your Honors. Once again, let me begin at the beginning. And the beginning is that these policies don't have a duty to defend. It's not part of the contract that the Court's considering. The policies in one sense arch, disclaim any duty to defend, and in the other sense it's only about coverage for indemnification and settlement. Now, how can we get to a contractual analysis involving the duty to defend when it's not part of the contract in the first place? The answer is we can't. And there is no Pennsylvania case or case from this Court that says that the four corners of the complaint are the arbiter of coverage in policies that don't involve a duty to defend. All those cases involve the duty to defend, lupu being case in point. And that's all it's about. None of those cases move to the next step and say, okay, what happens if it's a policy that covers a settlement made on the eve of trial, and how do we evaluate that? Now, the second point to be made is the insurers were not oblivious to this. In the trial court, they conducted two years of discovery on the facts in the underlying action. Nobody said, wait a minute, that's a complete waste of time. We are talking about the duty to defend, the four corners of the complaint, and let's back up and figure that out. In fact, on summary judgment, the insurers affirmatively argued that the case wasn't about the duty to defend. Take a look at App 9675-76, App 7963, App 8750, App 8772-73. And the reason they weren't talking about the duty to defend is this was about the duty to indemnify, and it is different. And I apologize I didn't have those cases when I stood up here before, but let me read from the DeCoster case from the Pennsylvania Superior Court. Unlike the duty to defend, a determination of the duty to indemnify is not necessarily limited to the factual allegations of the underlying complaint. So what year was that opinion? That was 2013. Now, it's a contextual inquiry. That's all I'm arguing. The complaint has causes of action in it. It has particular allegations in it that reveal the nature of the claims, and when you make that examination here, even if you want to stick to the four corners, you get the potential for coverage. If you look at the implied warranty causes of action in the complaint, they are broader than contract specifications. They talk about industry standards as applicable. They talk about standard operating procedures. The complaint talks about the product being defective. Those allegations have to be liberally read in my favor. It's not the labels on the causes of action that matters. And are there tort claims lurking here? Of course there are. Implied warranty is itself. What about Mr. Cozen's argument that the Minnesota court granted summary judgment on all the tort claims? Not on the warranty claims, Your Honor, and the implied warranty claims are sourced in common law duties, suitability, merchantability. Second, where do these claims come from? They claim from customers, and the customers are a step away, and they certainly have tort claims. Does that make a difference? It makes a big difference. This Court said that in Pittsburgh plate glass and in imperial casualty. Those kinds of claims made by third parties over defective products are the classic thing that's covered by a comprehensive general liability policy, and Indelex made that precise distinction. Didn't SAPA argue in the underlying action that the tort claims should be barred because they were duplicative of the contracted warranty claims? The tort claims can be barred, but that doesn't change the allegations in the complaint or the conduct that underlies them. So what we're looking at is the nature of the claims themselves. Now, what I do want to point out is that this is not a case where we contracted to make an end product for Marvin. This is a case where we supplied a component part that they put in the end product, and it was that end product after the extrusions were cut, and it was subject to weather conditions in the coastal regions when the defect came about and caused the injury. That's a material difference. Indelex says that it is. This Court has said that it is, and it's a material difference in light of all the occurrence definitions in the policies. Now, last thing as to the other coverage provisions that are involved here. This idea that the occurrence provision overtakes everything is not borne out by the policy's language. It doesn't affect the argument that we're making on custom and usage for the product-completed operations. All we're asking there is that the occurrence definition and that definition in the policy, products-completed operations, be read side-by-side in light of the trade usage evidence, which is exactly what the Sunbeam case says. We have a whole history of unrefuted custom evidence here that these product claims would be covered. It was not addressed, and it was ignored. Sunbeam says you can't do that. Isn't that really language that deals with limits of a policy? It deals with the construction of the policy terms themselves. And this Court said that in Aston Johnson, and Sunbeam said that directly. Secondly, as to the insured contract provisions, it's the same analysis. One of those provisions doesn't even have the word occurrence in it. And the one that does says, does the insured contract predate the occurrence? Well, of course it did here. The insured contract was the indemnity agreement that they alleged, that is Marvin, that brought all these claims to fore that we had to pay for. So most certainly there's an argument for coverage under that provision, independent of anything else that's going on. Not to the exclusion of the occurrence definition, but read them side-by-side in light of the record. I have one question about Indilex. If you assume everything the same about Indilex, but take out the strict liability and personal injury claims, does it come out the same way? Indilex, those claims are the ones that are bottomed on tort duties of care. That's the basis for my question. Yes. We have third-party claims bottomed on tort duties of care in this case. They weren't packaged up in a lawsuit. But read the complaint. Where did the damage come from? It came from the customers wanting repairs to their homes, which included the windows and doors, which were not the products that we made, which squarely aligns this case with Indilex. Thank you. Thank you, sir. Thank you very much to everybody. We will take this matter under advisement and get back to everybody shortly. Thanks again.